IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JERMAINE WITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:21CV881 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jermaine Witt brought this action to obtain review of a final decision of the Commissioner of Social Security denying his claim for social security disability insurance benefits and a period of disability. The Court has before it the certified administrative record and cross-motions for judgment.

## I.  PROCEDURAL HISTORY

In 2019, Plaintiff filed an application for disability insurance benefits and a period of disability alleging a disability onset date of January 1, 2015, later amended to May 5, 2016. (Tr. 13, 38, 349-52.) The application was denied initially and upon reconsideration. (Tr. 13, 230-234, 244-53.) After a hearing, the ALJ concluded in his July 29, 2021, decision that Plaintiff was not disabled under the Act. (Tr. 13-27, 32-71.) On September 14, 2021, the Appeals Council denied a request for review, making the ALJ's determination the Commissioner's final decision for purposes of review. (Tr. 2-4.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court, therefore, is not whether Plaintiff is disabled but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DECISION

The ALJ followed the relevant sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. § 404.1520. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999).[1] The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of May 5, 2016, through his date last insured of December 31, 2018. (Tr. 15.) He next found the following

---

[1] "The Commissioner uses a five-step process to evaluate disability claims." *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to his [or her] past relevant work; and (5) if not, could perform any other work in the national economy." *Id.* A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. *Id.*

severe impairments at step two: degenerative disc disease, degenerative joint disease, depressive disorder, anxiety disorder, posttraumatic stress disorder, migraine headache disorder, and pes planus. (Tr. 15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1. (Tr. 19.)

The ALJ next set forth Plaintiff's Residual Functional Capacity ("RFC"), concluding that Plaintiff could perform light work

> with lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; sitting for up to 4 hours; standing and walking for up to 4 hours; using a cane for ambulation; frequent reaching, handling, fingering and feeling bilaterally; occasional use of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; no exposure to unprotected heights, dangerous machinery, or ladders, ropes or scaffolds; no concentrated exposure to pulmonary irritants such as chemical odors, smoke, fumes, or gases; performance of only simple routine repetitive tasks and simple work-related decisions not at a production pace; occasional interaction with supervisors and coworkers; occasional interaction with the public; and ability to adapt to occasional changes in the workplace.

(Tr. 21.)

At step four, the ALJ concluded that the claimant was unable to perform his past relevant work. (Tr. 25.) At step five, the ALJ concluded that there were other jobs in the national economy that Plaintiff could perform. (Tr. 26.)

## IV. ISSUES AND ANALYSIS

Plaintiff raises four objections. First, Plaintiff contends that "[t]he ALJ failed to adequately account for the vocationally limiting effects of [his] migraine headaches in the

3

RFC." (Docket Entry 12 at 4.) Second, he contends that "[t]he ALJ erred by failing to properly evaluate the medical opinion of Dr. [Kenneth] Detrick." (*Id.* at 10.) Third, he contends that "[t]he structure of the SSA is constitutionally invalid." (*Id.* at 13.) Fourth, Plaintiff contends that "[t]he ALJ's appointment violates the Appointments Clause." (*Id.* at 14.) As explained in greater detail below, none of these objections warrants relief.

## A. Migraines

First, Plaintiff contends that "[t]he ALJ failed to adequately account for the vocationally limiting effects of [his] migraine headaches in the RFC." (Docket Entry 12 at 4.) As explained below, this argument is without merit.

The RFC measures the most a claimant can do in a work setting despite the physical and mental limitations of his impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1545(a)(1); *see also Dunn v. Colvin*, 607 F. App'x 264, 272 (4th Cir. 2015) (claimant's RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).") (internal citation omitted); *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

"Social Security Ruling 96-8p explains that the RFC 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific

4

medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (internal quotations omitted). An ALJ need not discuss every piece of evidence in making an RFC determination. *See Reid v. Comm. of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). However, the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Brown v. Commissioner*, 873 F.3d 251, 269 (4th Cir. 2017). As to the role of the function-by-function analysis, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

Recently, the Fourth Circuit has held that "meaningful review is frustrated when an ALJ goes straight from listing the evidence to stating a conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (explaining that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion"). Instead, the ALJ "must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (alteration in original) (quoting *Monroe*, 826 F.3d at 189). In particular, the ALJ "must build a logical bridge between the limitations he finds and the [vocational expert] evidence relied upon to carry the Commissioner's burden at step five in finding that there are a significant number of jobs available to a claimant." *Brent v. Astrue*, 879 F. Supp. 2d 941, 953 (N.D. Ill. 2012). An ALJ's failure to do so constitutes reversible error. *See Lewis v. Berryhill*, 858 F.3d 858, 868 (4th

5

Cir. 2017). Where an ALJ's "analysis is incomplete and precludes meaningful review," remand is appropriate. *Monroe*, 826 F.3d at 191.

Here, the ALJ carefully considered the entire record and formulated an RFC supported by medical examinations, opinions, reports, testimony, and additional evidence in the record. (Tr. 21-25.) In considering the evidence regarding Plaintiff's migraines, the ALJ cited Plaintiff's testimony of experiencing up to eleven headaches and nine migraines monthly, and his reports of three to four migraines weekly accompanied by photophobia, phonophobia, vomiting, vertigo, and shoulder and neck pain. (Tr. 21-22, 42-43, 47-48.) The ALJ noted that, when formulating the RFC, he "took into consideration the claimant's statements made during the hearing, especially his description of symptoms related to . . . migraines," but found that a more restrictive RFC was not warranted in light of the evidence. (Tr. 22.) The ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of symptoms were not entirely consistent with other evidence in the record, noting for example that objective medical findings and Plaintiff's reported daily activities reflected an ability to perform work-related activities within the extensive limitations set forth in the RFC. (Tr. 25.)

More specifically, with respect to objective medical findings, medical records from the relevant period contain few if any diagnostic findings relating to Plaintiff's migraines. (*See generally* Tr. 700-1076.) As noted by the ALJ, medical examinations from Plaintiff's neurologists, primary care physicians, and physical and psychological consultive examiners produced normal results, including normal mental status reports. (Tr. 16-17, 20, 22-23, 515-16, 538, 547-48, 570, 626, 630-32, 639-40, 642, 714, 726, 742, 749, 765, 824-25, 841, 844, 852-

6

53, 862, 915-916, 972, 982, 1000.) For example, despite reports of extreme symptoms and frequency of his migraines, Plaintiff met with VA providers for various reasons on dozens of occasions during the relevant period but sought treatment for migraines twice. (Tr. 781, 778-832; *see also generally* Tr. 700-1076.) In fact, although Plaintiff alleges multiple migraines weekly, none of his medical treatment notes reflect that he reported suffering from a migraine at any of his appointments, and only one note suggested that he was recovering from a migraine. (Tr. 801, *and see generally* 700-1076.) By way of further example, Plaintiff saw chiropractor Timothy Long, D.C., a total of seven times in March and April 2016, including a neurological evaluation, but Plaintiff never reported migraines. (Tr. 782, 832-38, 907, 1068.) Similarly, in 2017, just two months after Plaintiff reported almost-daily headaches and incapacitating migraines every other day to Dr. Kenneth J. Detrick, Plaintiff saw a neurologist and made no mention of migraines. (Tr. 931, 827-28.) In fact, medical records indicate that Plaintiff did not seek migraine treatment from a neurologist for four years. (*See generally* Tr. 700-1076.) This lack of symptom reporting by Plaintiff is inconsistent with someone who has alleged near-daily prostrating headaches that can cause nausea, vomiting, dizziness, etc. *See also Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 885 (N.D. Ill. 2019) ("The absence of complaints where it would have been natural to have made them is a substantial basis for rejecting or discounting Plaintiff's present claims.") (collecting cases).

Additionally, as the ALJ noted in his decision, whenever statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the ALJ must consider other evidence in the record to determine if such

symptoms limit the ability to do work related activities. (Tr. 21.) *See* 20 C.F.R. § 404.1529(c)(3). That is what the ALJ did here. (Tr. 23-25.) For example, in terms of Plaintiff's reported activities, the ALJ pointed to "an array of activities of daily living" that indicate an ability to perform work activities as established in the RFC. (Tr. 23.) Plaintiff's activities do not reflect the severity of migraine symptoms alleged, particularly complaints that migraines worsened with physical activity. (Tr. 931; Docket Entry 12 at 9.) Plaintiff shopped, mowed, did light housework, washed dishes, vacuumed, drove, exercised, played golf, meditated, cooked, attended church regularly, and helped his children with daily and school activities. (Tr. 17, 20, 23, 24, 435, 908, 829-30, 55-57, 915, 490, 1029, 985, 796, 807, 922.) He practiced group yoga multiple times without complaints of migraines. (Tr. 795-96, 799, 807, 810.) Similarly, despite reports of multiple migraines per week that caused light/noise sensitivity, Plaintiff watched television and played video games daily, and used a computer to take online college classes. (Tr. 433, 436, 713, 726.)

Finally, when Plaintiff did report migraines, primarily relating to seeking disability benefits, his complaints were conflicting and inconsistent. Plaintiff reported to Dr. Steven Landau that he experienced severe migraines multiple times weekly but reported to Dr. Bert Lucas two months later that he "might" experience 3-4 migraines a month. (Tr. 907, 914.) Plaintiff reported that his migraines began in 2010 and also that they began in 2005. (Tr. 576, 580, 1065.) Plaintiff reported that migraine pain worsened with physical activity, but also reported working out, and that exercise increased his energy levels and made him feel better. (Tr. 632, 931, 935; Docket Entry 12 at 9.) Plaintiff's records also indicate that when he took

8

medication for his migraines, he experienced improvement. (Tr. 19, 1052-66.)

Plaintiff argues that the ALJ did not build a logical bridge from the evidence to his conclusion because "it is not clear how frequently he believes [Plaintiff] is experiencing these headaches, for what duration of time he believes the headaches last, and whether [Plaintiff] would be impacted by his photophobia and phonophobia." (Docket Entry 12 at 7.) However, Plaintiff fails to address his multiple inconsistent reports regarding his migraines. (Docket Entry 12 at 4-7, *see generally* Tr. 39-1076.) Nonetheless, the ALJ acknowledged that Plaintiff had frequent migraines and accounted for them in the RFC, and he referenced his consideration of Plaintiff's subjective reports of migraines throughout the decision. (Tr. 15-25.) Plaintiff's suggestion that the ALJ has not considered Plaintiff's migraines "*at all*," particularly considering that he found migraines to be a severe impairment and discussed them specifically in his decision, is incorrect. (Tr. 15-25; Docket Entry 12 at 7 (emphasis in original).) The ALJ reviewed the evidence relating to migraines and concluded that Plaintiff was able to perform light work with significant limitations. As demonstrated in this Recommendation, these findings are supported by substantial evidence.

In a further attempt to convince this Court that the ALJ did not properly account for his migraines, Plaintiff cites to the undersigned's Recommendation in *Porterfield v. Berryhill*, No. 1:18-cv-319-TDS-JLW, slip op. (M.D.N.C. Aug. 6, 2019) (adopted Aug. 23, 2019) ("Recommendation") and to *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83 (4th Cir. 2020). (Docket Entry 12 at 7-10.) However, Plaintiff fails to recognize the significant distinctions between those cases and this one.

9

Unlike this case, the claimant in *Porterfield* actively pursued treatment for migraines from multiple providers, routinely met with neurologists, and provided consistent accounts of migraine pain, duration, and frequency during the relevant period. (Docket Entry 12, Attach. 1 at 5-6.) Also, unlike this case, when medication did not control her migraines, the *Porterfield* claimant sought escalating treatment. (*Id.*) In addition to the differences in the underlying facts, the ALJ's decision in the present case provides significant articulation relating to Plaintiff's subjective and inconsistent reports of migraines and the evidence in the record. (Tr. 15-25; Docket Entry 12, Recommendation at 7.) As noted, the ALJ here explained that Plaintiff's statements were inconsistent with other evidence in the record and pointed to objective medical evidence and Plaintiff's daily activities indicating that he was not as limited as alleged. (Tr. 21-25.) Additionally, in *Porterfield*, the undersigned took issue with that ALJ's lack of proper consideration of the claimant's escalating treatment efforts. (Docket Entry 12, Attach. 1 at 9.) No such consideration was necessary in the present case because Plaintiff here did not seek escalating treatment.

Plaintiff's use of the *Arakas* decision also fails. The *Arakas* court focused exclusively on fibromyalgia and held that objective medical findings were not necessary to that particular disease. *Arakas*, 983 F.3d at 97. This case does not involve fibromyalgia. Moreover, contrary to Plaintiff's arguments, recent agency guidance provides that, when evaluating "a primary headache disorder," the ALJ should "consider[] objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source]." SSR 19-4p, 2019 WL 4169635 at *2, 5, 7-8. SSR 19-4p also discusses the types of objective medical evidence relevant to migraines

10

and explains that a claimant's allegations as to the intensity, persistence and limiting effects of his alleged migraines symptoms need not be accepted when formulating the claimant's RFC. *Id.* at *2-6, 8. Rather, SSR 19-4p explains that "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." *Id.* at *8. In any event, the ALJ did more than simply consider objective medical evidence here. As explained throughout this Recommendation, the ALJ considered objective medical evidence, Plaintiff's testimony and reports of his symptoms, medical opinions, and prior administrative medical findings in making his RFC determination. The ALJ also discussed Plaintiff's migraines and accounted for them in the RFC. Substantial evidence supports these findings.

### B. Medical Opinions

Second, Plaintiff contends that "[t]he ALJ erred by failing to properly evaluate the medical opinion of Dr. [Kenneth] Detrick." (Docket Entry 12 at 10.) This argument has no merit.

The longstanding requirements calling for adjudicators to weigh medical opinions and give special deference to treating source opinions have changed. *See* 20 C.F.R. § 404.1520c(a) (effective March 27, 2017). Now, adjudicators "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."[2] *Id.* Nevertheless, an ALJ must

---

[2] The new regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2017). The new regulations also define a "finding . . . about a medical issue made by . . . Federal and State agency

11

consider and articulate in the administrative decision how persuasive he or she finds each medical opinion or prior medical finding in a claimant's case record. *See id.* § 404.1520c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record."). When a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings as a class. *See id.* § 404.1520c(b)(1). In doing so, the ALJ is "not required to articulate how [he] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

In evaluating persuasiveness, the ALJ must articulate two factors: supportability and consistency. *Id.* § 404.1520c(b)(2). Supportability is an internal check that references objective medical evidence and supporting explanations that come from the source itself. *Id.* § 404.1520c(c)(1); *see also Revisions to Rules*, 82 Fed. Reg. at 5853 (defining supportability as "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation"). Consistency is an external check that references evidence from other medical and nonmedical sources. *Id.* § 404.1520c(c)(2); *see also Revisions to Rules*, 82 Fed. Reg. at 5853 (defining consistency as "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim"). The ALJ must only address the three other persuasiveness factors—relationship with the claimant, specialization, and the catchall "other factors"—when two or more medical

---

medical and psychological consultants at a prior level of review" as a "[p]rior administrative medical finding." *Id.* § 404.1513(a)(5).

12

opinions, or prior administrative medical findings about the same issue, are equally persuasive in terms of supportability and consistency. *Id.* §§ 404.1520c(b)(3), 404.1520c(c)(3)-(5).

Also, "[s]tatements that [claimants] are or are not disabled, . . . able to work, or able to perform regular or continuing work," are statements on an issue reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3). Statements on issues reserved to the Commissioner are deemed evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 404.1520b(c)(1)-(3). The regulations also make clear that, for such claims, "we will not provide any analysis about how we considered such evidence in our determination or decision." 20 C.F.R. § 404.1520b(c).

Here, the ALJ evaluated each medical opinion, noting whether it was persuasive, and articulating the bases for his findings (Tr. 23-25). As to psychiatrist Dr. Kenneth Detrick's opinion, the ALJ addressed it as follows:

> Dr. Detrick also completed a questionnaire regarding the claimant's headache symptoms, noting that the claimant reported daily headaches and migraine headaches occurring every other day that lasted from a few hours to all day and accompanied with nausea, vomiting, sensitivity to light and sound, changes in vision, and dizziness. Dr. Detrick opined, "Veteran has severe headaches almost every day and prostrating, incapacitating headaches at least a few times per week. He would be expected to miss an average one half to one day of work [because of] a prostrating headaches per week as well as significantly reduced reliability and productivity when he is experiencing the non-prostrating but still significant headache pain. Overall the veteran would be expected have moderate to severe impairment of occupational reliability and productivity because of his headache pain, essentially as documented in the last evaluation by this examiner." (B4F/13-16)

> Dr. Detrick's opinions are of limited persuasive value as they are

13

generalized and general conclusions as to the claimant's
employability and do not outline specific vocational limitations. I
did consider Dr. Detrick's opinions as to the frequency of
claimant's headaches and the severity of them but the opinion is
not fully consistent with the other reports of the claimant, reports
during scheduled medical appointments or the testimony at
hearing. The ultimate issue of the ability to work is reserved to
the Commissioner.

(Tr. 25.)

As demonstrated above, the ALJ clearly articulated that he did not find Dr. Detrick's

opinions persuasive, explaining that Dr. Detrick's opinions are of limited persuasive value as

they are generalized and general conclusions as to the claimant's employability and do not

outline specific vocational limitations. (Tr. 25.) The ALJ did consider Dr. Detrick's opinions

as to the frequency of claimant's headaches and the severity of them but concluded that the

opinion was not fully consistent with the other reports of the claimant, reports during

scheduled medical appointments, or the testimony at hearing. (Tr. 25.) The ALJ also accurately

noted that the ultimate issue of the ability to work is reserved to the Commissioner. (Tr. 25.)

More specifically, Dr. Detrick opined that Plaintiff would have "significantly reduced

reliability" due to non-prostrating headaches and would miss "an average one half to one day

of work" weekly due to prostrating headaches. (Tr. 25, 932.) However, Dr. Detrick's opinion

is not *supported* by significant diagnostic findings, of which there are none, and he did not

include any vocational limitations or medical findings to *support* his conclusion that Plaintiff's

headaches rendered him unable to work. (Tr. 930-32.) Dr. Detrick's opinion is based entirely

upon a check-box disability questionnaire that he filled out based on Plaintiff's self-reports of

migraines. (Tr. 930-32.) Substantial evidence, therefore, supports the ALJ's finding that Dr.

14

Detrick's resulting general conclusions were not persuasive. Additionally, Dr. Detrick's opinion is *inconsistent* with Plaintiff's testimony and other reports regarding frequency and duration of symptoms. (Tr. 45-48, *see generally* 700-1076.) As previously noted, Plaintiff made inconsistent reports of the frequency and duration of his headaches and was also able to perform a wide array of daily activities.

Moreover, when Plaintiff sought treatment from healthcare providers, he rarely mentioned migraines, rendering Dr. Detrick's opinions *inconsistent* with Plaintiff's treatment records. (*See generally* Tr. 700-1076). *See also Joe R.*, 363 F. Supp. 3d at 885 ("The absence of complaints where it would have been natural to have made them is a substantial basis for rejecting or discounting Plaintiff's present claims.") (collecting cases). Finally, Dr. Detrick's opinion about Plaintiff's employability is non-persuasive, as such determinations are reserved solely to the Commissioner (Tr. 25). 20 C.F.R. § 404.1520b(c)(3). As required by the relevant regulations, the ALJ properly analyzed the supportability and consistency of Dr. Detrick's opinion in finding that it was not persuasive.

## C. The Structure of the SSA

Third, Plaintiff contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 12 at 13.) More specifically, Plaintiff contends that

> The United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause. *Seila Law*, 591 U.S. ---, 140 S.Ct. at 2197. This constitutionally invalid structure of the CFPB is identical to that of the SSA. The Commissioner of SSA is the singular head of the Agency, serves for a six-year term, and cannot be removed by the President except for cause

15

("neglect of duty or malfeasance in office"). *See* 42 U.S.C. § 902(a)(3). As the Supreme Court observed, the "insulation from removal by an accountable President is enough to render the agency's structure unconstitutional." *Seila Law*, 140 S.Ct. at 2204. For this same reason, SSA's structure is unconstitutional as it violates the separation of powers with the Commissioner of SSA insulated from democratic accountability.

The government deprived this claimant of a valid administrative adjudicatory process. Under 42 U.S.C. § 405(b)(1), only the Commissioner of SSA can make findings of fact and issue final decisions as to benefits eligibility. *See also* 42 U.S.C. § 902. Here, the SSA statutory restriction does not apply merely to the confirmed head of SSA but also more broadly to "[a]n individual serving in the Office of Commissioner." *See* 42 U.S.C. § 902(a)(3). This phraseology offers removal protection not merely to the confirmed Commissioner of SSA but also to any individual serving in that office, including for an individual serving in an acting capacity for the time allowed under the law.[1] Thus, these removal restrictions also apply to the current acting Commissioner, Kilolo Kijakazi.[2] *Accord Sylvia*, at *3; *Albert*, at *3; *Tafoya*, at *5; *Dante*, at *8.

[1] *Sylvia v. Kijakazi*, 2021 WL 4692293, *3 (N.D. Tex. Sep. 13, 2021); *Albert v. Kijakazi*, 2021 3424268, *3 (D. Alaska Aug. 5, 2021); *Tafoya v. Kijakazi*, 2021 WL 3269640, *4-5 (D. Col. Jul. 29, 2021); *Dante v. Saul*, 2021 WL 2936576, *5-6 (D.N.M. Jul. 13, 2021).

[2] Interestingly enough, the Agency's apparent position regarding the current Acting Commissioner, Kilolo Kijakazi, is that she draws her authority *only* from the Social Security Act. *See* Legality of Service of Acting Commissioner, Social Security Administration, Feb. 1, 2022, at 1, https://www.gao.gov/assets/b-333543.pdf. The implications are that she enjoys the same removal protections as the Commissioner but without any temporal limitation on her service. In short, she is protected from removal by the President; she may serve indefinitely, even exceeding the traditional term of the Commissioner, without the Advice and Consent of the Senate; and Defendant's counsel is likely to argue that

16

Article III courts cannot provide relief for this violation of the constitution. Thus, if SSA's likely position is accepted, it is difficult to ascertain where there is any accountability for this unelected official.

The ALJ's delegation of authority in this case came from Kilolo Kijakazi, the acting Commissioner, and is therefore constitutionally defective. *See* HALLEX I-2-0-2(A) (explaining that an ALJ's authority to hear and decide a case is delegated from the Commissioner of SSA). Therefore, the ALJ's decision must also be vacated because he did not have the authority to hear or decide the case given the delegation of authority from an acting Commissioner who had no constitutional authority to head the Agency. Upon remand, the case should be heard and decided de novo by an ALJ who does not suffer from the same constitutional defect. *See Lucia*, 585 U.S. ---, 138 S.Ct. at 2053-55; *see generally Carr*, 141 S.Ct. 1352.

(Docket Entry 12 at 13-14.)

The Commissioner, in turn, contends that this argument does not entitle Plaintiff to a rehearing, if for no other reason than because he "[c]annot [s]how the [r]equired [n]exus [b]etween the [r]emoval [r]estriction [h]e [c]hallenges and the [d]enial of [h]is [b]enefits [c]laim." (Docket Entry 17 at 30.) In other words, the Commissioner contends that even assuming § 902(a)(3) violates the separation of powers to the extent it limits the President's authority to remove the Commissioner without cause, this by itself would not support setting aside an unfavorable SSA disability benefits determination, absent a showing "that the restriction actually cause[d] him harm," which is absent here. (*Id.* at 31.)

The undersigned agrees with his previously written recommendations on this question, along with other judges from this Court who have considered this issue at considerable length and concluded that the Commissioner has the better argument here. Put differently, any defect

17

in the removal restriction in question here had no impact on the outcome of Plaintiff's proceedings.[3] This objection warrants no relief.

## D. Appointments Clause

Fourth, Plaintiff contends that "[t]he ALJ's appointment violates the Appointments Clause." (Docket Entry 12 at 14.) More specifically, Plaintiff contends that:

> The ALJ's appointment by Nancy Berryhill on July 16, 2018 (*see* SSR 19-1p), violates the Appointments Clause because Nancy Berryhill was no longer the Acting Commissioner on that date and, therefore, lacked the authority to ratify the ALJ's appointment. Nancy Berryhill, previously the Deputy Commissioner of Operations ("DCO"), became the Acting Commissioner of SSA on January 20, 2017, when President Donald Trump assumed office and then Acting Commissioner Carolyn Colvin resigned. *See* Violation of the 210-day Limit Imposed by the Vacancies Reform Act of 1998- Commissioner, Social Security Administration, Mar. 6, 2018, at 1, https://www.gao.gov/assets/700/690502.pdf [*10] ("GAO Report").

---

[3] *See, e.g., Cowan v. Kijakazi*, No. 1:21CV196, 2022 WL 3446078, at *14, 17-19 (M.D.N.C. Aug. 17, 2022) (Auld, M.J.) (concluding that claimant "cannot show that Section 902(a)(3)'s removal restriction caused the denial of her benefits claim") (citation and quotations omitted*), adopted by* Slip Op. (M.D.N.C. Sept. 21, 2022) (Osteen, J.); *Taylor v. Kijakazi*, No. 1:21CV648, 2022 WL 4668273, at *7 (M.D.N.C. Aug. 2, 2022) (Webster, M.J.) ("Plaintiff has failed to demonstrate any actual harm arising from Section 902(a)(3)"), *report and recommendation adopted*, No. 1:21CV648, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (Osteen, J.); *Gilmore v. Kijakazi*, No. 1:21CV420, 2022 WL 2869047, at *11 (M.D.N.C. July 21, 2022) (Auld, M.J.) (rejecting similar argument where claimant failed to demonstrate the required nexus between the removal provision and the denial of her SSI claim), *report and recommendation adopted*, No. 1:21CV420, 2022 WL 3446133 (M.D.N.C. Aug. 17, 2022) (Biggs, J.); *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345, at *9 (M.D.N.C. July 20, 2022) (Auld, M.J.) (same) *report and recommendation adopted*, Slip Op. (M.D.N.C. August 19, 2022) (Eagles, J.); *Brown v. Kijakazi*, No. 1:20CV1035, 2022 WL 2222683, at *10 (M.D.N.C. June 21, 2022) (Auld, M.J.), *report and recommendation adopted*, No. 1:20CV1035, 2022 WL 3681719 (M.D.N.C. Aug. 25, 2022) (Bigg, J.); *Hutchens v. Kijakazi*, No. 1:20CV1124, 2021 WL 5834409, at *10 (M.D.N.C. Dec. 9, 2021) (Auld, M.J.), *report and recommendation adopted sub nom. Hutchens v. Kijkazi*, No. 1:20-CV-1124, 2022 WL 1441227 (M.D.N.C. Jan. 5, 2022) (Eagles, J.).

18

The Federal Vacancies Reform Act ("FVRA") explains that an individual serving as an acting officer of the United States may do so for no longer than 210 days beginning on the date the vacancy occurs (5 U.S.C. § 3346(a)(1)), or for no longer than 210 days from the date of submission of a first or second nomination for the office to the Senate (5 U.S.C. § 3346(a)(2)).

On March 6, 2018, the GAO reported that Berryhill's service as Acting Commissioner under the FVRA had expired on November 16, 2017, and that her service after that date violated the FVRA. GAO, at 2. The GAO Report stated Berryhill could not use "Acting Commissioner" as her title but could - as DCO - continue to perform *delegable* functions and duties of the Commissioner's position. *Id.* Thereafter, on April 17, 2018, President Trump nominated Andrew Saul to be SSA's Commissioner.

Thus, Berryhill's purported ratification of the ALJ's appointment in this case on July 16, 2018 was statutorily ineffective because her period of acting service had expired on November 16, 2017, and the FVRA did not allow her to resume acting as Commissioner at a later date. As one district court recently observed:

> Berryhill was "the person serving as an acting officer" from January 20, 2017 until November 16, 2017 when her term expired. When Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner and Saul's nomination did not create a new vacancy. Therefore, by its plain language, § 3346(a)(2) does not apply to Berryhill because she was not serving as Acting Commissioner when Saul was nominated.

*Brian T.D. v. Kijakazi*, No. 19-cv-2542-DTS, 2022 U.S. Dist. LEXIS 10690, *31-32 (Jan. 20, 2022 D. Minn.).

Additionally, as previously noted, the SSA statutory restriction on the President's removal authority does not apply merely to the confirmed head of SSA but also more broadly to "[a]n individual serving in the Office of Commissioner." *See* 42

19

U.S.C. § 902(a)(3). Thus, the statute appears to offer removal protection not merely to the confirmed Commissioner of SSA but also to any individual serving in that office, including for an individual serving in an acting capacity for the time allowed under the law. *Accord Sylvia*, at *3; *Albert*, at *3; *Tafoya*, at *5; *Dante*, at *8. This would mean that, even if Nancy Berryhill were acting appropriately under FVRA, her actions would still be *ultra vires* because of the unconstitutional removal protections.

The appropriate remedy when the ALJ lacked a proper appointment from a constitutional commissioner in violation of the Appointments Clause is to remand the matter to a different and properly appointed official – and notably, harm is presumed when an ALJ lacks a proper appointment. *See Carr*, 141 S.Ct. 1352; *Lucia*, 138 S.Ct. 2044; *Probst*, 980 F.3d at 1023.

(Docket Entry 12 at 15-16.)

Once again, however, the undersigned agrees with his own prior evaluation of this issue, as well as the analysis of the other judges from this Court, Circuit, and others who have considered this issue at considerable length and concluded that this appointment clause argument has no merit. As those cases explain at length, Berryhill properly served as Acting Commissioner under the spring-back provision of § 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs in July 2018.[4] This objection warrants no relief.

---

[4] *See, e.g., Taylor v. Kijakazi*, No. 1:21CV648, 2022 WL 4668273, at *9 (M.D.N.C. Aug. 2, 2022) (collecting cases) (Webster, M.J.), *report and recommendation adopted*, No. 1:21CV648, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (Osteen, J.); *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345, at *13 (M.D.N.C. July 20, 2022) (Auld, J.) (collecting cases), *report and recommendation adopted*, Slip Op. (M.D.N.C. Aug. 19, 2022) (Eagles, J.); *Smoak v. Kijakazi*, No. 5:22-CV-00007-KDB, 2022 WL 4590584, at *3 (W.D.N.C. Sept. 29, 2022) ("Other courts have considered this issue and have found that § 3346(a)(2) contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018. This Court agrees with this authority. Indeed, the plain language of 5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role as Acting Commissioner on the date that Andrew Saul was nominated. Consequently, she had the necessary statutory authority to ratify the appointment of the ALJs in 2018 and thus Plaintiff's second argument fails.") (collecting cases) (citations and quotations omitted).

20

## V. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is legally correct, supported by substantial evidence, and susceptible to judicial review. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment (Docket Entry 11) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be **GRANTED**, and the final decision of the Commissioner be upheld.

_____
Joe L. Webster
United States Magistrate Judge

January 4, 2023
Durham, North Carolina

21